

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00001-CR
_____


KENNIE LEWIS COOK, JR., Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2019F00062



Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess
Dissenting Opinion by Justice Stevens

# OPINION

A Cass County jury convicted Kennie Lewis Cook, Jr., of aggravated sexual assault of a child. Cook was sentenced to forty years' imprisonment and was ordered to pay a $1,000.00 fine. On appeal, Cook argues that the jury's verdict is not supported by legally sufficient evidence,[1] the trial court should have ruled on his *Batson*[2] challenge, and his counsel rendered ineffective assistance by failing to preserve his *Batson* challenge. Cook also argues that the trial court erred by allowing an officer to testify that he believed the child victim and by permitting a witness to testify in violation of Rule 614, the witness sequestration rule.

We find that legally sufficient evidence supported the jury's verdict of guilt. However, we find that the trial court erred in admitting the officer's direct opinion on the child victim's credibility and conclude that Cook was harmed by the testimony. As a result of this finding, which is dispositive of Cook's remaining issues, we reverse the trial court's judgment and remand the case for a new trial.

## I. Legally Sufficient Evidence Supports the Jury's Verdict of Guilt

### A. The Evidence at Trial

The State's first witness was the victim, Chance Scallion,[3] who was seven years old when he made an outcry of sexual abuse against Cook. According to Chance, Cook sexually abused him at his great-grandmother's home after a church service at Hendrix Temple Institutional

---

[1]In companion cause numbers 06-20-00002-CR and 06-20-00003-CR, Cook also appeals from two other convictions of aggravated sexual assault of the same child.

[2]*Batson v. Kentucky*, 476 U.S. 79 (1986).

[3]We use pseudonyms for the child victim and his family to protect the identity of the child. *See* TEX. R. APP. P. 9.10.

Church of God and Christ, where Cook served in various capacities, including as an organist and music director.

The evidence at trial established that Chance often went to church with Laura, who was his great-grandmother and the church superintendent. Laura lived two blocks from the church and, after church concluded at 1:30 p.m., would always return to her home to prepare and serve a meal for the bishop and her grandson, Darrius, who attended almost every Sunday, and Cook, who ate with the group every other Sunday. Chance alleged that Cook abused him when he and Cook were alone in the living room of Laura's house after church on Sunday "when Granny went to the bathroom."

According to Chance, Cook directed him to retrieve the television remote, "cut off the TV, [and] then . . . pulled [his] pants down," followed by his underwear. Chance said that Cook "put his finger in [his] butt," and "sucked [his] little thing." The child identified his "little thing" as "what [he] use[d] to go to the bathroom with . . . number one." Chance said his little thing was "[h]ard" and that Cook said, "It tastes good." The child also testified that Cook "made [him] suck his little thing" with his mouth and that Cook's "little thing" was soft and looked like a black crayon. Chance testified that the acts made him feel sad and that he felt "[m]ad" when he saw Cook because of what he did. Cook stopped when they heard Laura coming out of the bathroom and made "[Chance] pull back up [his] pants."

Chance's mother, Fiona, testified that she found Chance sucking the head of a yellow rubber duck during bath time and later caught him sucking his brother's penis. When she asked Chance about his behavior, Fiona said Chance pointed to his penis and alleged that Cook had

3

sucked it. Fiona also said that Chance "put his hands in two girls' tops, in their shirt tops, and was touching their bottoms." Chance testified that he had "[s]ucked his [four-year-old brother's] little thing" because he had thought about Cook.

Fiona testified that she had grown up with Cook, that their families had close ties, and that she allowed Chance to be around Cook and accept gifts from him. According to Fiona and Laura, Cook gave Laura money for Chance and bought Chance everything he asked for, including clothes, a backpack, school supplies, and toys. Cook also took Chance to the movies, would drop the child off at school, and took him to band practice at another school where Cook was employed as the band director. Testimony from both Chance and Cook showed that Chance was also allowed to spend two nights at Cook's apartment, unsupervised, where he slept with Cook in Cook's bed. Laura testified that Cook lived alone and did not have a wife or girlfriend.

After Chance's outcry to Fiona, Fiona went to the church with Chance and asked him to tell Darrius about his allegations against Cook. Chance testified that he denied the allegations in front of Darrius "[b]ecause somebody else was outside that day" who did not "need to know" about the abuse and said instead that Cook had only "whooped [him]." Both Fiona and Laura testified that Cook spanked Chance. According to Laura, with her permission, Cook hit Chance with a belt for "showing out" in church by playing with other boys during class. Darrius testified that he told Cook about his conversation with Fiona and Chance. According to Chance, Cook never touched him again after Fiona went to the church to speak to Darrius.

In spite of the allegations, the evidence showed that Cook was a trusted family friend and that few believed Chance. Laura testified that she did not believe Chance's allegations because

4

she knew Cook well and it was "not his character" and because the incidents allegedly occurred at her home. Darrius's sister, Dolly, described Cook, who she had known since she was a little girl, as an honest, church-going man. Chance's great-aunt, Lucille, also testified that Cook was an upstanding gentleman whom she had known for fifteen years and that he had never told a lie. Theodus Luckett, III, director of fine arts at the school where Cook worked, testified that he had known Cook for fourteen years and had supervised him at work, and he described Cook as a phenomenal worker who had professional relationships with his students.

Laura, Darrius, and Lucille also believed that Cook lacked an opportunity to abuse Chance at Laura's home. They testified that Cook was never left alone with Chance because there was always someone else at Laura's home after church, that there was a clear line of sight into the living room from the kitchen, and that someone else would have witnessed the abuse had it occurred. Laura added that she only used the restroom when she first returned home from church before others arrived and never used the restroom while guests were in her home. Darrius said he watched television in the living room every Sunday that he was present and that, if Laura took a nap, she would sleep on the couch in the living room. However, Darrius also testified that he and the bishop were not present every Sunday and that Cook had arrived at Laura's house before him on one or two occasions.

Several family members also thought that Chance had been sexually abused by Fiona's husband, Tucker, although the testimony established that he had been and remained incarcerated during the alleged incident for domestic violence against Fiona. Laura testified that she believed Tucker had sexually abused Chance because she had always been suspicious of him and because

Chance had told her that Tucker had "messed with" him. Darrius also testified that Chance did not make an allegation against Cook but made one against Tucker instead. During cross-examination, Fiona, who was under suspicion of committing two felony offenses after Chance's allegations were reported, admitted that Tucker had recorded himself playing with his own bottom. However, Chance testified in front of the jury that Tucker did not inflict any abuse on him and that Cook was the only person who had sexually assaulted him.

Nevertheless, Laura opined that Chance had been coached by Fiona to make up the allegations against Cook because she was "a liar," "a manipulator," and "just not right." Darrius and Lucille, who described Fiona as "a liar, a schemer, and . . . a troublemaker," agreed with that assessment. Dolly also testified that Fiona "likes to lie and manipulate" compulsively, that she had witnessed Fiona teaching Chance how to lie to obtain government benefits, and that Fiona had falsely accused her of sexually touching one of her other sons.

To discredit Chance's outcry, Laura made an audio recording of the child several months after the allegations. The audio recording showed that Laura repeatedly told Chance that Cook loved him and missed him. As a result of Laura's leading questions, Chance denied the allegations and said that Cook had only spanked him and that his "momma [was] the one that started it." When Laura asked Chance if anybody had "messed with" him, Chance said that Tucker had.

Yet, the Atlanta Police Department arrested Cook after Chance spoke with Jessica Kelly, a forensic interviewer with the Texarkana Children's Advocacy Center (CAC), who testified that Chance made three allegations of abuse. According to Kelly, Chance said that "somebody at

6

church had been touching him" and that "Cook had made him suck his little thing," which looked like a crayon and "tasted nasty." Kelly explained that "little thing" was Chance's term for penis. Kelly also testified that Chance said that Cook had "put his finger in his bottom" and that it felt hard "on the inside." Kelly told the jury that she looked for signs of coaching, deception, or manipulation but found "nothing that made [her] believe that that child "had been coached or had said something that he did not believe to be true." Kelly described the process of grooming for the jury and explained that predators groom children, their families, and the community.

Kelly also testified that Laura's recording of Chance, which showed the leading nature of Laura's questions, amounted to an improper interview that was not capable of obtaining an unbiased statement. According to Kelly, Chance denied having been sexually abused by anyone other than Cook. Jima Hicks, a sergeant with the Atlanta Police Department, testified that, while there was no DNA evidence substantiating the allegations, he arrested Cook after Chance said during his CAC interview that his rectum had been penetrated by Cook's finger.

Kaleigh Dodson, Chance's licensed professional counselor, testified that she had many counselling sessions with Chance, who exhibited signs of and was experiencing trauma. Dodson reported that Chance said Cook had touched his private parts when he should not have. Dodson testified that Chance brought up Cook on his own during counseling sessions and that Chance never mentioned that anyone else had touched him. Dodson saw no red flags indicating deception, believed Chance was not faking the trauma symptoms, which were consistently present in his many counseling sessions, and did not think that Chance was being manipulated

7

into making a false accusation. Dodson added that Chance, who had been held back one grade, "was definitely developmentally behind a 7-year-old, even," and would not have been able to sustain any deception over time given his intellectual stage.

Cook, who had never been convicted or accused of a crime, testified in his defense. Cook said that Chance's home life was horrible and that he felt that he needed stability in his life from a man that he could look up to. As a result, Cook acted as Chance's caregiver and role model because he was told that the child was not getting much care. He admitted that he spanked Chance on the buttocks, but claimed it was with his hand, not a belt. Cook told the jury that Laura was supportive of his role in Chance's life.

Cook denied the allegations, claimed that he was not sexually attracted to boys, and said that Darrius was present every time he went to Laura's home. Cook, who had a doctorate in education and was certified as a school principal, admitted that Chance had slept in his bed with him twice but told the jury that he saw no problem with sleeping in the same bed with a child that he was not related to. Cook opined that Fiona made up the allegations because he had spanked Chance.

In rebuttal, the State called Fiona's sister, Arwin, and Fiona's mother, Georgia. Arwin testified that, when Fiona brought Chance to speak with Darrius at the church, Chance was "scared and nervous . . . [in] a way [she] had never seen him before." Arwin testified that she believed Chance's allegations, that the child would not lie about something so serious, and that she did not believe that he was coached. Arwin testified that Laura talked with her about the allegations but was most concerned with Cook's reputation, not Chance. Georgia testified that

8

Chance would not lie about the allegations against Cook and that she did not believe Fiona taught him to lie.

After hearing all the conflicting evidence, the jury convicted Cook of three counts of aggravated sexual assault of Chance.

### B.      Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt."  *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)).  "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented."  *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)).  "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge."  *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or

unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Malik*, 953 S.W.2d at 240.

In this case, the State alleged that Cook intentionally or knowingly caused "the penetration of the anus of Chance Scallion (pseudonym), a child who was then and there younger than 14 years of age, by defendant's finger." *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B). In companion cause number 06-20-00002-CR, the State alleged that Cook "intentionally or knowingly caused 'the penetration of the mouth of Chance Scallion (pseudonym), a child who was then and there younger than 14 years of age, by the defendant's sexual organ.'" In companion cause number 06-20-00003-CR, the State alleged that Cook intentionally or knowingly caused "the sexual organ of Chance Scallion (pseudonym), a child who was then and there younger than 14 years of age, to contact the mouth of the defendant."[4]

## C.    Analysis

Chance, who was younger than fourteen, testified (1) in support of Cook's conviction in this case, that Cook removed his pants and underwear and "put his finger in [his] butt"; (2) in support of Cook's conviction in 06-20-00002-CR, that Cook "made [him] suck his little thing," which was soft and looked like a black crayon, with his mouth; and (3) in support of Cook's conviction in 06-20-00003-CR, that Cook "sucked [his] little thing." Chance told the jury that the term "little thing" meant "what [he] used to go to the bathroom with . . . number one."

---

[4]Cook has questioned the legal sufficiency of the evidence in all three cases. For the sake of judicial economy, we address whether the evidence was legally sufficient to support Cook's convictions in the companion cases in this opinion.

10

Cook argues that the evidence is legally insufficient because Chance's testimony was not corroborated. However, corroboration of Chance's testimony is not required because "[t]he testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault." *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd). As a result, Chance's testimony alone was legally sufficient to establish each and every element of the offenses alleged by the State.

Moreover, Chance's allegations were corroborated. Fiona testified that Chance pointed to his penis and alleged that Cook sucked it, and according to Hicks, Chance said during his CAC interview that Cook had penetrated Chance's rectum with his finger. Dodson testified that Chance made allegations of sexual abuse against Cook during counseling sessions, and according to Kelly, Chance said Cook had put his "hard" finger "on the inside" of his bottom and made him suck Cook's penis, which looked like a crayon and "tasted nasty."

Even so, Cook argues that the jury's verdict was not rational due to conflicting evidence refuting the plausibility of Chance's allegations and implying the possibility of coaching by Fiona. In other words, Cook wants this Court to re-weigh the evidence. However, "[u]nder a legal sufficiency review, 'our role is not to become a thirteenth juror. This Court may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder.'" *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). As the fact-finder, it was the jury's role to decide whether it believed Chance's testimony that Cook abused him at Laura's house or the testimony addressing lack of opportunity. Because Darrius testified that

11

there were occasions that Cook arrived at Laura's house before him and Chance testified that the abuse happened when Laura was using the restroom, the jury was free to believe Chance. Given Kelly's testimony about the statements Chance made in his CAC interview and Dodson's testimony that Chance consistently referred to Cook during counseling sessions, exhibited no signs of coaching, and lacked the intellectual capability to sustain any deception over time, the jury was free to reject the speculative testimony that Fiona had coached Chance.

Because we find the evidence legally sufficient to support each of Cook's convictions of aggravated sexual assault, we overrule Cook's first point of error.

## II. Cook Was Harmed by the Admission of the Officer's Direct Testimony of Chance's Credibility

Next, Cook argues that the trial court erred in allowing Hicks to testify about the credibility of Chance's allegations, as shown by the following exchange:

> Q [The State] . . . . Why did you think that that CAC interview was sufficient to go forward?
>
> A That victim, I felt like that victim, of his age, gave a credible statement that –
>
> [Defense Attorney]: Objection, Your Honor. He's not qualified to say that the victim's statement is credible. Additionally, he's not qualified to go into the details of victim's statement
> .
> THE COURT: Any response?
>
> [The State]: This is the basis for his following actions. It's just what formed his basis for continuing the case, Your Honor.
>
> [Defense Attorney]: Judge, he can't pass on the credibility of a witness.

THE COURT:  The jury will be able to decide the credibility of the witness.  That'll be sustained as to credibility.  You may continue.

Q      [The State]:  Did you think the child was lying?

A      No.

[Defense Attorney]:  Objection, Your Honor.

THE COURT:  Overruled.

[Defense Attorney]:  That's a comment on the credibility of the witness.

THE COURT:  Overruled.

## A.     Standard of Review

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion."  *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)).  "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'"  *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)).  "We may not substitute our own decision for that of the trial court."  *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).  "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case."  *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

**B.      Admission of the Officer's Testimony Was Erroneous**

"The Texas Court of Criminal Appeals found that '[v]irtually every jurisdiction which has addressed, in the context of a child sexual assault case, the admissibility of direct testimony as to the truthfulness of the child complainant, has held that such direct testimony is inadmissible.'" *Fuller v. State*, 224 S.W.3d 823, 832 (Tex. App.—Texarkana 2007, no pet.) (quoting *Yount v. State*, 872 S.W.2d 706, 711 n.8 (Tex. Crim. App. 1993)). In *Yount*, the Court of Criminal Appeals reasoned that "a direct opinion as to the truthfulness of a witness 'crosses the line' under Rule 702 because it does more than 'assist the trier of fact to understand the evidence or to determine a fact in issue'; it *decides* an issue *for* the jury." *Yount*, 872 S.W.2d at 709 (citing *Duckett v. State*, 797 S.W.2d 906, 914–15 (Tex. Crim. App. 1990), *disapproved on other grounds by Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993)). This rule applies equally to expert and lay witness testimony. *Brown v. State*, 580 S.W.3d 755, 765 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd). Accordingly, the trial court erred by admitting Hicks's opinion on whether Chance was testifying truthfully.

**C.      The Admission of the Officer's Testimony Affected Cook's Substantial Rights**

A violation of an evidentiary rule constitutes "non-constitutional [error] . . . and will be disregarded unless it affected the appellant's substantial rights." *Allen v. State*, 436 S.W.3d 815, 823 (Tex. App.—Texarkana 2014, pet. ref'd) (quoting *Bryant v. State*, 282 S.W.3d 156, 161 (Tex. App.—Texarkana 2009, pet. ref'd) (quoting *Russell v. State*, 155 S.W.3d 176, 181 (Tex. Crim. App. 2005))). Thus, "we need not reverse if, after examining the record as a whole, we have fair assurance that the error did not influence the jury's deliberations to appellant's

14

detriment or had but a slight effect." *Id.* (citing *Ladd v. State*, 3 S.W.3d 547, 566 (Tex. Crim. App. 1999); TEX. R. APP. P. 44.2(b)).

In conducting our harm analysis on this issue,

we may consider, among other things: (1) the strength of the evidence of the defendant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of [Hicks's] conclusions, including whether [his] opinion was effectively refuted; and (4) whether the State directed the jury's attention to [Hicks's] testimony during arguments. *Sandoval v. State*, 409 S.W.3d 259, 293–94 (Tex. App.— Austin 2013, no pet[.]) (citing *Coble* [*v. State*], 330 S.W.3d [253,] 286–88 [(Tex. Crim. App. 2010)].

*Brown*, 580 S.W.3d at 765–66 (finding harmless error in officer's testimony that the victim was credible while the defendant was not).

As for the first factor, though legally sufficient, the evidence of guilt was far from overwhelming. The trial court heard Chance's testimony about the acts, which were corroborated by Fiona and Kelly. Dodson testified that Chance exhibited signs of trauma and sexual abuse and identified Cook as the perpetrator. Yet, Fiona, Kelly, and Dodson's testimony all depended on the credibility of Chance's allegations. Considering the testimony from other members of the family who believed that Chance had been sexually abused by Tucker, we must conclude that this first factor does not weigh in favor of finding harmless error.

As for the second factor, we note that typically, "[e]rror in the improper admission of evidence is harmless if the same or similar evidence is admitted without objection at another point in the trial." *Brown*, 580 S.W.3d at 766–67 (citing *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010); *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)). Here, while Kelly said that, during Chance's interview, "there was nothing that made [her]

15

believe that that child had been coached or had said something that he did not believe to be true," she clarified during cross-examination that she could not render an opinion on the child's credibility. Though Dodson testified that she saw no signs of deception and did not believe Chance was faking his trauma or that he was manipulated into making up allegations, her testimony did not cross the line of offering a direct opinion on Chance's credibility. While Arwin testified that she did not believe Chance would lie about the allegations, that she believed Chance, and that she did not think he had been coached, Cook objected to the entirety of Arwin's testimony on Rule 614 grounds. Cook also lodged strenuous objections to Georgia's testimony about Chance's credibility. As a result, we do not find that the second factor alleviated harm from the admission of Hicks's testimony.

Considering the last two factors, Hicks's testimony on Chance's credibility was short, but carried with it the weight of testimony from a peace officer who had been with the Atlanta Police Department for nineteen years. In closing, the State posited that Chance's CAC interview was "a credible statement." The prosecutor also interjected her personal opinion into the trial and referred to Hicks's testimony when she argued, "[The State called Laura to testify] because *I* was so confident in [Chance's] credible, clear statement, that there was nothing [Laura] could say that was going to undermine that. And in fact, we got a whole lot that corroborated that." (Emphasis added).[5] The State's last words to the jury emphasized the importance of the issue of Chance's credibility when it argued,

---

[5]"For a prosecutor to argue outside the record and inject personal opinion is improper." *Boyd v. State*, 643 S.W.2d 700, 706 (Tex. Crim. App. [Panel Op.] 1982); *see Johnson v. State*, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985) ("The implication of special expertise coupled with an implied appeal to the jury to rely on that expertise in deciding the contested issues before it is improper."), *superseded on other grounds by Mayes v. State*, 816 S.W.2d 79 (Tex.

16

It's not good enough to just say, "I believe Chance. I believe something happened, but --." If you return a verdict of not guilty, you're saying that Chance is lying, and you're believing that tainted, deceptive audio recording that [Laura] tried to pass off as the truth. If you do that, you're going to set a child molester free to prey upon other children. . . . Wolves walk among us. We caught one. You need to call him what he is, guilty of aggravated sexual assault of a child.

In the context of ineffective assistance of counsel, this Court has found that counsel's failure to object to an officer's testimony about a child victim's credibility resulted in prejudice because it served as "unchecked bolstering of the victim," which denied the defendant a fair trial. *Fuller*, 224 S.W.3d at 836; *see Sessums v. State*, 129 S.W.3d 242, 248 (Tex. App.—Texarkana 2004, pet. ref'd). Similarly, Chance's credibility was the central issue at trial. While the jury was instructed that statements made by and questions asked by counsel were not evidence and that they were to resolve issues of "the believability of the witnesses and what weight to give their testimony," those instructions permitted the jury to consider Hicks's inadmissible opinion in deciding the issue of Chance's credibility.

Moreover, in cases like this where there is no physical evidence to support the charges, the jury must make its decision based solely upon credibility determinations. And in this case, the jury was not only called upon to evaluate Chance's credibility, but also Cook's credibility and the credibility of competing witnesses presented by both sides. Because an investigating officer is not directly aligned with either party, his testimony carries an independent quality not found in the other witnesses. And, due to his position and experience investigating such cases, his testimony also carries an aura of reliability as well as the State's imprimatur. Accordingly,

Crim. App. 1991); *Irving v. State*, 573 S.W.2d 5, 6 (Tex. Crim. App. [Panel Op.] 1978); *Ezernack v. State*, No. 06-19-00014-CR, 2019 WL 3949964, at *2 (Tex. App.—Texarkana Aug. 22, 2019, no pet.) (mem. op.).

allowing the investigating officer to give an opinion regarding the child victim's truthfulness in such cases carries a greater risk of harm than similar testimony by other witnesses because it invites the jury to forego the difficult credibility evaluations of competing witnesses and simply defer to the credibility opinion of the one authoritative witness not aligned with either side.

Twenty-five years ago, the Court of Criminal Appeals acknowledged this very risk in *Schutz v. State*, where it noted,

> A jury would expect a mother to testify that her son was truthful, and would likely view such testimony with natural skepticism. On the other hand, the testimony of a police officer qualified as an expert on the investigation of sexual assault cases would likely carry exceptional weight and an aura of reliability which could lead the jury to abdicate its role in determining [the complainant's] credibility.

*Schutz v. State*, 957 S.W.2d 52, 72 (Tex. Crim. App. 1997) (quoting *Matter of G.M.P.*, 909 S.W.2d 198, 206 (Tex. App.—Houston [14th Dist.] 1995, no pet.) (noting that, "in the absence of concrete evidence, the jury may be unduly inclined to rely upon the expert's opinion on the issue as to whether the sexual abuse occurred")).

As noted by the Court of Criminal Appeals, the jury in this case might have expected the various witnesses for and against the prosecution to be biased in favor of the side presenting their testimony but give "exceptional weight and an aura of reliability" to Hicks's testimony. By presenting Hicks's testimony and by emphasizing that testimony in final argument, the State gave the jury an opportunity to forego making its own determination regarding the credibility of the witnesses and defer to Hicks's more authoritative and independent testimony that Chance was being truthful. As a result, we do not have fair assurance that the State did not essentially "*decide* [the] issue *for* the jury." *Yount*, 872 S.W.2d at 709 (emphasis added). Stated differently,

18

we do not have a fair assurance that the trial court's error in this case did not influence the jury's deliberations to Cook's detriment or had but a slight effect. We sustain this point of error.[6]

## IV.  Conclusion

We reverse the judgment and remand the case for a new trial.


Ralph K. Burgess
Justice


**DISSENTING OPINON**

I agree with the majority opinion's conclusion that the trial court erred in admitting Officer Hicks's testimony about the child victim's credibility. Even so, because the record here included (1) the child's testimony about the abuse from which the jury could make its own credibility assessment and (2) unobjected-to evidence from other witnesses about the child victim's credibility, the admission of Hicks's statement did not affect Cook's substantial rights. As a result, I respectfully dissent.

The majority opinion correctly states that we consider the following factors in assessing harm from this non-constitutional error:

> (1) the strength of the evidence of the defendant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of [Hicks's] conclusions, including whether [his]

---

[6]Because the issues we address are dispositive, we do not address Cook's *Batson* or ineffective assistance of counsel issues.

opinion was effectively refuted; and (4) whether the State directed the jury's attention to [Hicks's] testimony during arguments.

*Brown v. State*, 580 S.W.3d 755, 765–66 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd). (finding harmless error in officer's testimony that the victim was credible while the defendant was not).

My consideration of these factors leads to the conclusion that the error in admitting Hicks's testimony about Chance's credibility did not affect Cook's substantial rights. This is because, "[e]ven in cases in which credibility is paramount, Texas courts have found harmless error when the inadmissible expert testimony was only a small portion of a large amount of evidence presented that the jury could have considered in assessing the victim's credibility." *Id.* (quoting *Barshaw v. State*, 342 S.W.3d 91, 96 (Tex. Crim. App. 2011)).

Our conclusion that the evidence was legally sufficient supports a finding that this non-constitutional error was harmless. Chance testified about the acts of sexual abuse, and the jurors, who witnessed his testimony, were in the best position to assess his credibility. Chance's testimony was corroborated by Fiona and Kelly, and Dodson said Chance had identified Cook as the perpetrator. While the majority opinion discounts this corroborating evidence because "Fiona, Kelly, and Dodson's testimony all depended on the credibility of Chance's allegations," Dodson also testified that, based on her experience, Chance exhibited signs of trauma and sexual abuse. Members of the family also believed that Chance had been sexually abused, but they placed the blame on Tucker. The majority opinion cites to this evidence but wholly ignores Chance's denial of being abused by Tucker. Instead, Chance told the jury that Cook was the

20

only person who had abused him. As a result, I find that this first factor weighs slightly in favor of finding harmless error.

In assessing the second factor, the majority correctly notes that error from the admission of testimony is harmless if similar testimony is admitted without objection. *Brown*, 580 S.W.3d at 766; *see Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection."); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.")). Here, several witnesses testified about Chance's credibility. Laura testified that, even though she disbelieved Chance's allegations against Cook, she believed that Chance would tell the judge and jury the truth. Kelly said that, during Chance's interview, "there was nothing that made [her] believe that that child had been coached or had said something that he did not believe to be true." Dodson testified that she saw no signs of deception and did not believe Chance was faking his trauma or that he was manipulated into making up allegations. Also, Arwin testified that she did not believe Chance would lie about the allegations, that she believed Chance, and that she did not think he had been coached.[7] As a result, the second factor weighs heavily in favor of finding no harm. *See Sandoval v State*, 409 S.W.3d 259, 294 (Tex. App.—Austin 2013, no pet.).

---

[7]In seeking to de-emphasize this testimony, the majority simply writes that Cook objected to the entirety of Arwin's testimony based on Rule 614 of the Texas Rules of Evidence, the witness sequestration rule, but fails to explain how such an objection could preserve any complaint that the witness was testifying about the child's credibility after the trial court overruled the Rule 614 objection. Had the majority opinion addressed the point of error raised, the law would lead to the conclusion that the trial court did not abuse its discretion in admitting Arwin's testimony because she was neither listed nor expected to be a witness. *See Guerra v. State*, 771 S.W.2d 453, 474 (Tex. Crim. App.

21

Considering the third factor, Hicks's testimony on Chance's credibility was not particularly strong given his short answer and the existence of other evidence that the Atlanta Police Department found Chance's statement to be credible, such as the testimony of Officer Greg Restelle, who testified that Cook was arrested because of Chance's CAC interview. *See Brown*, 580 S.W.3d at 767 (citing *Sandoval*, 409 S.W.3d at 295) (finding officer's testimony regarding credibility not particularly strong because "[g]iven that he forwarded this case to the district attorney's office for prosecution after his investigation, one could logically assume that he found [victim] credible, her allegations truthful, and believed appellant was guilty of committing this sexual assault")). The strength of Hicks's testimony was further lessened by the testimony of the family members who said they did not believe the allegations.

As for the last factor, the State did not mention Hicks's testimony in closing argument. Instead, the State focused on Chance's testimony and the consistent nature of his allegations made to Fiona, Kelly, and Dodson. Also, the jury was instructed on the presumption of Cook's innocence and the requirement that the State prove every element of the offense beyond a reasonable doubt. The jury was also instructed that statements made and questions asked by counsel were not evidence and that they were to resolve issues of "the believability of the witnesses and what weight to give their testimony." After hearing Cook's testimony and observing his demeanor, in conjunction with all the other evidence admitted at trial, the jury reasonably could have decided on its own that Chance was credible. *See Brown*, 580 S.W.3d at 767 ("holding trial court's error in admitting psychologist's testimony regarding children's

1988); *Harris v. State*, 122 S.W.3d 871, 882 (Tex. App.—Fort Worth 2003, pet. ref'd); *Loven v. State*, 831 S.W.2d 387, 399 (Tex. App.—Amarillo 1992, no pet.).

truthfulness did not affect defendant's substantial rights when the testimony was not calculated to inflame jury's emotions, substantially similar testimony was allowed without objection, jury charge instructed jury that it was the sole judge of credibility of witnesses, and jury heard complainant provide detailed account regarding defendant's sexual assault") (citing *Flores v. State*, 513 S.W.3d 146, 171–72 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd)).

After reviewing the entire record, I have fair assurance that the error in the admission of Hicks's opinion on Chance's credibility either had no influence on the jury's deliberations or had such a slight effect that it was imperceptible. As a result, I would affirm the trial court's judgment.


                                            Scott E. Stevens
                                            Justice


Date Submitted:     November 23, 2020
Date Decided:       October 20, 2021

Publish